# EXHIBIT A

Clerk of the Superior Court
*** Electronically Filed ***
K. Scott, Deputy
3/13/2026 11:12:37 AM
Filing ID 21649497

Chris Mason (SBN: 019891)
Stephen F. Best (SBN: 034976)
**BUCHALTER LLP**
15279 North Scottsdale Road, Suite 400
Scottsdale, Arizona 85254-2659
Telephone: (480) 383-1800
Facsimile: (480) 824-9400
Email:   cmason@buchalter.com
Email:   sbest@buchalter.com

Attorneys for Plaintiff SecurityNational Mortgage Company

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| SECURITYNATIONAL MORTGAGE COMPANY, a Utah corporation, | No.  **CV2026-011132** |
| | **COMPLAINT** |
| Plaintiff, | |
| v. | **(Civil – Tortious Interference)** |
| | Tier 3 |
| CMG MORTGAGE, INC., a California corporation dba CMG FINANCIAL and CMG HOME LOANS, | **(Jury Trial Requested)** |
| | COMMERCIAL COURT ASSIGNMENT REQUESTED |
| Defendant. | |

For its Complaint in the above-entitled matter, Plaintiff Security National Mortgage Company alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff SecurityNational Mortgage Company ("**SNMC**") is a Utah corporation.

2.     Defendant CMG Mortgage, Inc. is a California corporation doing business as CMG Financial and CMG Home Loans ("**CMG**"), is licensed to conduct business in Arizona as a mortgage lender, and has offices, employees and conducts business in the State of Arizona.

3.     The acts and omissions complained of in this Complaint against CMG were

-1-

BUCHALTER 107818624v4

performed, completed, occurred in, and/or directed into Maricopa County, Arizona.

4. This Court has original jurisdiction over this matter in accordance with A.R.S. § 12-123 and Article VI, § 14(3) of the Arizona Constitution, and the amount in controversy exceeds the minimum jurisdictional requirements for the Superior Court.

5. Venue is proper in this Court pursuant to A.R.S. § 12-401.

6. Tier 3 discovery is appropriate for this action in accordance with Rule 26.2 of the Arizona Rules of Civil Procedure.

### NON-PARTIES

7. On information and belief, Chip Larson ("Larson") is an individual residing in California, and at all relevant times was a CMG Executive Retail Sales Senior Vice President, responsible for growth, recruiting, coaching, and sales strategy.

8. On information and belief, Susan Walker ("Walker") is an individual residing in California, and at all relevant times was a CMG Retail Sales Senior Vice President, responsible for CMG's day-to-day operations in CMG's Western Territory.

9. On information and belief, Vicki Johnson ("Johnson") is an individual residing in Arizona, and at all relevant times was a CMG Area Sales Manager and loan originator.

10. On information and belief, Rebecca St. Thomas ("St. Thomas") is an individual residing in Arizona, and at all relevant times was a CMG Sales Manager and loan originator.

11. On information and belief, Lisa Nesper ("Nesper") is an individual residing in Arizona, and at all relevant times was a CMG loan originator.

12. On information and belief, Suzy Jackson ("Jackson") is an individual residing in Arizona, and at all relevant times was a CMG loan originator.

/ / /

-2-

**GENERAL ALLEGATIONS**

13.    CMG engaged in a calculated campaign to wrongfully raid four SNMC branches located in Scottsdale, Arizona and Glendale, Arizona.

14.    By July 2024, senior management of CMG, including Larson and Walker, were involved in discussions with SNMC's Scottsdale and Glendale area managers, including Steve Rausch ("Rausch") and Jess Trader ("Trader").

15.    Those communications included emails, phone calls, and in-person meetings wherein CMG expressed interest in acquiring SNMC's entire branch operations in Scottsdale and Glendale.

16.    On information and belief, in its communications with SNMC employees of the Scottsdale and Glendale branches, CMG explained that it sought to recruit and sponsor entire branches rather than individual originators, in order to gain immediate market position at the expense of its competitors.

17.    Rausch and Trader did not disclose these discussions to SNMC at any time prior to their departure.

18.    Most, if not all, employees working out of the Scottsdale and Glendale branches were subject to express restrictive covenants set forth in their employment agreements with SNMC.

19.    As part of their employment agreement with SNMC, the employees working out of the Scottsdale and Glendale branches agreed to not solicit any of SNMC's clients (prospective or otherwise) or employees while employed by SNMC and for a period of twelve (12) months after their employment with SNMC ended as follows:

g.    Originator further acknowledges, promises and agrees that:

i)    During originator's employment with SNMC:
A.    Originator shall not directly or indirectly solicit, encourage or facilitate, or attempt to solicit, encourage or facilitate, any borrower, customer or

-3-

BUCHALTER 107818624v4

client of SNMC, or prospective borrower, customer or client of SNMC, to engage in or transact business with any other person or entity for services or products similar to those provided by SNMC; and.

B. Originator shall not directly or indirectly solicit, encourage, or facilitate, or attempt to solicit, encourage, or facilitate, any of SNMC's employees, consultants, referral sources, business partners, borrowers, customers or clients to terminate or reduce their relationship with SNMC.

ii) Upon the termination of Originator's employment with SNMC for any reasons, Originator shall immediately return to Originator's supervisor all Company equipment, including all computers, devices, tablets, cell phones, keys, credit cards, and papers and computer records, and any copies thereof.

iii) All loans in process, leads, prospective loans, and loan applications provided to or worked on by Originator are SNMC's property and constitute Confidential Information. Originator shall not take any action to divert any of such leads, loan applications, loans in process, or prospective loans to a competitor or away from SNMC. Upon the termination of Originator's employment with SNMC for any reason, Originator shall immediately provide to SNMC a written account of all leads, prospective loans, loan applications, and loans in process as of the date of the termination of Originator's employment.

iv) During the twelve (12) months following the termination of Originator's employment with SNMC (such period not to include any period(s) of violation or periods(s) of time required for litigation to enforce the covenants herein), Originator shall not directly or indirectly solicit, encourage or facilitate, or attempt to solicit, encourage or facilitate, any of SNMC's employees or consultants to terminate or reduce their relationship with SNMC. (This Subsection 6.g.iv is inapplicable if Originator resides and primarily works in the state of California).

v) During the twelve (12) months following the termination of Originator's employment with SNMC (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein), Originator shall not directly or indirectly solicit, encourage or facilitate, or attempt to solicit, encourage, or facilitate, any of SNMC's referral sources, business associates, customers or clients to terminate or reduce their relationship with SNMC. (This Subsection 6.g.v is inapplicable if Originator resides and primarily works in the state of California).

vi) During the twelve (12) months following the termination of Originator's employment with SNMC (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein), Originator shall not directly or indirectly solicit, encourage or facilitate, or attempt to solicit, encourage, or facilitate, any borrower to refinance or otherwise pay off any loan made by SNMC during the preceding twelve (12) month period. (This Subsection 6.g.vi is inapplicable if Originator resides and primarily works in the state of California).

-4-

20. The employment agreements also contains the following confidentiality provision:

a. Originator acknowledges that by reason of Originator's employment hereunder, Originator will occupy a position of trust and confidence with SNMC and will have access to Confidential Information (as defined below) which is the unique and valuable property of SNMC. Originator acknowledges that "**Confidential Information**" includes, without limitation: technical data, trade secrets, know-how, research, product and service ideas and plans, information and materials concerning SNMC's business methods, processes, leads, loan programs, advertising programs, referral sources, marketing strategies, software, investor lists, products, borrowers, loan applicants, loans in process, borrowers' and prospective borrowers' loan files, loan applications, records, documents and personal information, software codes and designs, algorithms, developments, inventions, patent applications, processes, techniques, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, and information relating to, employees and consultants (including the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, and information relating to, suppliers, referral sources, business partners and customers (including referral sources, borrowers and other customers with whom Originator communicated or became acquainted during Originator's employment), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets and other business information of SNMC. SNMC's Confidential Information has been developed through the expenditure of substantial time, effort and money with the objective of maintaining the confidence of such information and not disclosing it to other persons.

b. Originator agrees that all times during Originator's employment with SNMC and following the termination of Originator's employment: (i) Originator will use the Confidential Information solely for SNMC's benefit and in performance of Originator's job duties for SNMC, and (ii) Originator will not disclose, either orally or in writing or directly or indirectly, any of the Confidential Information to any person, entity, or organization (except as Originator's duties may require) without SNMC's prior express written authorization.

\*\*\*

f. Originator acknowledges that all Confidential Information and all other documents, files, consumer personal and confidential information, electronic records and data, and records and materials of any sort pertaining to SNMC's business, whether prepared by Originator or otherwise coming into Originator's possession or control, are the sole and exclusive property of SNMC and that Originator has no right to keep or use such documents or things following termination of Originator's employment. Originator agrees that, upon any termination of employment, Originator shall not retain any such documents or things and will immediately return them to SNMC.

21. In short, the employees working out of the Scottsdale and Glendale branches promised to protect and maintain the confidentiality of SNMC's proprietary and confidential client information, not to take or remove Confidential Information from SNMC's premises or electronic data systems without SNMC's prior express permission, to follow all of SNMC's policies and

-5-

procedures for the protection and security of Confidential Information, and to immediately report to management any potential or actual security breach of loss.

22. The employees working out of the Scottsdale and Glendale branches also agreed not to solicit clients or employees of SNMC for a period of one year following the termination of their employment with SNMC.

23. The employment agreements also provide that "[u]pon the termination of Originator's employment with SNMC for any reason, Originator shall immediately return to Originator's supervisor all Company equipment, including all computers, devices, tablets, cell phones, keys, credit cards, and papers and computer records, and any copies thereof." (Agreement, Sec. 6(g)(ii)).

24. Each of these restrictive covenants were reasonable and necessary to protect SNMC's legitimate business interests, including maintaining its Confidential Information, and survived the termination of the employees of the Scottsdale and Glendale branches' employment with SNMC.

25. CMG is a residential mortgage lender.

26. CMG is aware that, in the home lending industry, employees are regularly subject to non-disclosure and non-solicitation agreements and covenants.

27. Therefore, CMG was aware that the employees of the Scottsdale and Glendale branches were subject to non-disclosure and non-solicitation covenants with SNMC.

28. By August 2024, Rausch and Trader had informed the employees of the Scottsdale and Glendale branches that a change in the Nationwide Multistate Licensing System ("NMLS") sponsorship was imminent, and advised them not to advance new loan applications with SNMC, but to send new client files and applications to CMG via Johnson or her colleagues instead.

-6-

29. On information and belief, the Scottsdale and Glendale loan originators did in fact send new client files and applications to CMG while they were employed by SNMC.

30. When CMG received these client files from SNMC-employed loan originators, CMG assigned "placeholder" loan originators, such as St. Thomas, Jackson, Johnson, and Nesper, to the loan files until SNMC's loan originators switched NMLS sponsorship to CMG.

31. Meanwhile, and in concert with CMG, Rausch used his access to SNMC-owned and SNMC-controlled customer relationship management ("CRM") accounts to download contact lists, referral data, customer information, and other proprietary data to personal devices with the intent to provide this data to CMG.

32. Rausch did in fact share this CRM data with CMG on September 12, 2024, despite being aware that SNMC would not authorize the release after he inquired about a CRM data transfer the previous day, September 11, 2024.

33. CMG was also aware that SNMC did not authorize the release of its CRM data to CMG after its Scottsdale and Glendale employees transferred to CMG because Rausch informed Walker, Larson, Trader, and CMG Marketing Director Rachel Foley ("Foley") of SNMC's position via email.

34. Notwithstanding the foregoing, CMG still assented to uploading to its own "Surefire" accounts the CRM data Rausch downloaded from SNMC when he still had access.

35. Indeed, CMG agents and employees condoned and facilitated Rausch's efforts, and knowingly uploaded SNMC's proprietary client data into its own systems, including CRM accounts.

36. On information and belief, CMG instructed or authorized this proprietary data migration to ensure continuity after SNMC's Scottsdale and Glendale operations transferred to CMG.

BUCHALTER 107818624v4

37.    On information and belief, CMG operated in concert with Rausch and Trader, and other SNMC Scottsdale and Glendale branch employees, knowingly inducing them to wrongfully solicit their colleagues in violation of their contractual obligations to SNMC.

38.    By the beginning of September 2024, CMG had made offers of employment to SNMC's Scottsdale and Glendale personnel.

39.    Additionally, CMG arranged to conduct in-person orientation training with SNMC's Scottsdale and Glendale personnel on September 5, 2024.

40.    Three sessions were held, one for each of the three branches led by Trader, Ryan Sutton ("Sutton"), and Jeremy Weeks ("Weeks"), respectively.

41.    The purpose of those sessions was for the Scottsdale and Glendale branches to pick up equipment, complete I9 forms, set up computers, and meet with CMG's licensing department representative(s) to transfer the Scottsdale and Glendale loan origination license sponsorships on NMLS to CMG.

42.    Subsequent trainings were scheduled for September 6, 2024, and throughout the remainder of the month, to orient the Scottsdale and Glendale branches with CMG's products, human resources and benefits, operations, marketing, and CMG generally, etc.

43.    At no point prior to September 5, 2024, did CMG or the SNMC employees working out of the Scottsdale or Glendale branches inform SNMC of the migration.

44.    On September 5, 2024, the entire SNMC workforce working out of the Scottsdale and Glendale branches – including loan originators, processors, and support staff – collectively resigned from SNMC.

45.    Concurrently, sponsorship applications were submitted to NMLS, and the loan originator licenses for the entire Scottsdale and Glendale branches switched from being sponsored by SNMC to being sponsored by CMG.

-8-

BUCHALTER 107818624v4

46.     Shortly following the migration, CMG re-assigned files from St. Thomas, Johnson, Jackson, and Nesper to the Scottsdale and Glendale loan originators who had generated the leads while still employed by SNMC.

47.     On information and belief, in concert with and at the direction of CMG, Rausch, Trader, Weeks, and Sutton facilitated and encouraged the diversion of new loans to CMG while their subordinates remained employed and compensated by SNMC.

48.     On information and belief, in concert with and at the direction of CMG, the Scottsdale and Glendale branches retained confidential customer lists, pending applications, and referral relationships that were proprietary to SNMC, following their migration from SNMC to CMG and in violation of their respective employment agreements with Plaintiff.

49.     On information and belief, CMG actively participated in the migration of SNMC's proprietary data to CMG by providing guidance to the Scottsdale and Glendale branches regarding storage of the proprietary data in its information systems (such as its computers, servers, CRM accounts, etc.), and by accepting it and integrating it into its own business operations.

50.     CMG knew or should have known the proprietary data belonged to SNMC, yet accepted and integrated it into its own business despite expending no effort or capital to develop it.

51.     CMG also conspired with Rausch to engage in a re-finance campaign to solicit SNMC's current customers in the Scottsdale and Glendale areas, substantially all of whose data had been shared with CMG without SNMC's knowledge or consent.

52.     After the migration of SNMC's proprietary information to CMG, CMG authorized and/or assisted in an email campaign claiming SNMC's Scottsdale and Glendale branches had merely undergone a "name change" to maintain client loyalty. This representation was false.

53.     Throughout the migration process, CMG operated in concert with Rausch and Trader, and other employees of the Scottsdale and Glendale branches, knowingly inducing them

-9-

BUCHALTER 107818624v4

to breach their duties of loyalty and contractual obligations.

54.    On information and belief, CMG offered signing bonuses or other compensation models designed to wrongfully compete with SNMC's proprietary compensation model, which it only could have known by obtaining SNMC's proprietary information from SNMC personnel.

55.    On information and belief, CMG's employment and other offers to the SNMC employees of the Scottsdale and Glendale branches were conditioned on full migration of SNMC's Scottsdale and Glendale personnel, operations and production to CMG.

## COUNT I
### (Interference with Contract or Business Expectancy)

56.    SNMC realleges and incorporates all preceding allegations as though fully set forth herein.

57.    SNMC had valid contracts with its Scottsdale and Glendale loan officers, which included non-solicitation covenants prohibiting them from taking "any action to divert any . . . leads, loan applications, loans in process, or prospective loans to a competitor or away from SNMC."

58.    CMG knew about the contracts, including the non-solicitation agreements.

59.    While knowing about the non-solicitation agreements, CMG still requested, encouraged, and aided Rausch, Trader, Sutton, Weeks, and/or other SNMC employees, to recruit and solicit SNMC's existing employees and clients to migrate to CMG.

60.    CMG further intentionally interfered with SNMC's contractual relationships by:

a.    Conspiring with, aiding, and/or abetting Scottsdale and Glendale loan officers to act in the capacity of CMG while concurrently employed by SNMC, in violation of their non-solicitation covenants; A.R.S. Title 6, Ch. 2, Art. 9, and Utah Code § 61-2c.

b.    Conspiring with, aiding, and/or abetting Scottsdale and Glendale loan officers in misrepresenting a material fact in the course of their business, including, without

-10-

BUCHALTER 107818624v4

limitation, falsely representing to SNMC's customers that the migration of SNMC's Scottsdale and Glendale branches to CMG was only a change of the business's name, or words to that effect.

61. CMG's conduct caused a breach or termination of its contractual relationships with the Scottsdale and Glendale loan officers.

62. CMG's conduct was illegal and/or improper for, without limitation, the following reasons:

a. CMG condoned, conspired with, aided, abetted, and/or induced the Scottsdale and Glendale loan originators to violate A.R.S. Title 6, Ch. 2, Art. 9 and Utah Code § 61-2c;

b. CMG condoned, conspired with, aided, abetted, and/or induced the SNMC Scottsdale and Glendale employees to violate their contractual restrictive covenants;

c. CMG's conduct violated an established standard of the mortgage lending trade and/or profession; and

d. Such other breaches as may be uncovered during discovery.

63. SNMC suffered and continues to suffer damage caused by the breach or termination of SNMC's contractual relationships with the Scottsdale and Glendale loan officers.

64. The breach resulted in direct financial losses, lost revenue, training costs, customer attrition, and other actual and compensatory damages in an amount to be proven at trial.

**COUNT II**
**(Misappropriation of Trade Secrets under both the**
**Arizona Uniform Trade Secrets Act and Federal Defend Trade Secrets Act)**

65. SNMC realleges and incorporates all preceding allegations as though fully set forth herein.

66. SNMC owned certain protectable trade secret information, including, without limitation:

-11-

a.      Information and materials concerning the Company's leads, referral sources, borrowers, loan applicants, loans in process, borrowers' and prospective borrowers' loan applications;

b.      Borrower and prospective borrower records;

c.      SNMC pricing information;

d.      CRM data, customer lists, and lists of pre-approved customers;

e.      Financial, marketing, and analytic information;

f.      Product information; and

g.      Internal policies, procedures, guidelines, regarding loan processing.

67.     The trade secret information was neither generally known nor readily ascertainable by proper means.

68.     The trade secret information, due to its confidentiality and secrecy, provide SNMC with a competitive advantage over competing entities, and derive independent economic value from not being generally known to other persons or entities who can obtain economic value from their disclosure or use.

69.     SNMC has invested significant resources in developing the trade secret information and has taken reasonable steps to maintain its secrecy.

70.     SNMC took reasonable measures to keep the trade secret information secret, including, without limitation:

a.      Requiring its employees with access to Confidential Information to sign employment agreements containing confidentiality, non-disclosure, and non-solicitation provisions, such as the Employment Agreements the Scottsdale and Glendale loan originators were required to sign in connection with their employment with SNMC;

b.      Conducting annual employee training to address client privacy and

-12-

BUCHALTER 107818624v4

confidentiality;

c.     Storing and maintaining the vast majority of the information at issue electronically in SNMC's computer systems and databases, which can only be accessed by SNMC employees who have been given express access to the information based on their need to work on the respective client's loan or mortgage file; and

d.     Storing and maintaining the vast majority of the information at issue on secure servers wherein the information and materials are password protected, and accessible only to certain employees with a business need who have been granted access.

71.     CMG facilitated, condoned, conspired with, aided, abetted, and/or induced the Scottsdale and Glendale loan originators to disclose SNMC's trade secret information to CMG, and subsequently used the trade secret information it wrongfully obtained.

72.     CMG misappropriated SNMC's trade secret information and used it for its own benefit and to compete with SNMC, including by soliciting away SNMC's employees and customers.

73.     CMG continues to use the trade secret information for its own benefit.

74.     As a direct and proximate result of CMG's misappropriation, SNMC has suffered and will continue to suffer substantial and irreparable damage, the full extent of which has not yet been determined and will be established at trial.

75.     Pursuant to the Arizona Uniform Trade Secrets Act and/or the U.S. Defend Trade Secrets Act, SNMC is entitled to injunctive relief and to recover from CMG any monetary damages sustained as a result CMG's misappropriation of SNMC's trade secret information, including both the actual loss caused by misappropriation and the unjust enrichment resulting from the misappropriation that is not taken into account in computing actual loss.

76.     Additionally, the misappropriation of SNMC's trade secret information by CMG

-13-

was willful and malicious and, therefore, the Court should award exemplary damages against CMG in an amount not to exceed twice any award of compensatory damages and/or award of damages for unjust enrichment.

77.    In addition, pursuant to the Arizona Uniform Trade Secrets Act and the U.S. Defend Trade Secrets Act, the Court should award SNMC its reasonable attorneys' fees.

## COUNT III
### (Misappropriation of Confidential Information)

78.    SNMC realleges and incorporates all preceding allegations as though fully set forth herein.

79.    SNMC owned certain confidential information, including without limitation:

a.    Information and materials concerning the Company's leads, referral sources, borrowers, loan applicants, loans in process, borrowers' and prospective borrowers' loan applications;

b.    Borrower and prospective borrower records;

c.    SNMC pricing information;

d.    CRM data, customer lists, and lists of pre-approved customers;

e.    Financial, marketing, and analytic information;

f.    Product information; and

g.    Internal policies, procedures, guidelines, regarding loan processing.

80.    The confidential information was neither generally known nor readily ascertainable by proper means.

81.    The confidential information provides SNMC with a competitive advantage over competing entities, and derives independent economic value from not being generally known to other persons or entities who can obtain economic value from its disclosure or use.

82.    SNMC has invested significant resources in developing the confidential information

-14-

BUCHALTER 107818624v4

and has taken reasonable steps to maintain its confidentiality.

83.    SNMC took reasonable measures to keep the confidential information confidential, including, without limitation:

a.    Requiring its employees with access to Confidential Information to sign employment agreements containing confidentiality, non-disclosure, and non-solicitation provisions, such as the Employment Agreements the Scottsdale and Glendale loan originators were required to sign in connection with their employment with SNMC;

b.    Conducting an annual employee training to address client privacy and confidentiality;

c.    Storing and maintaining the vast majority of the information at issue electronically in SNMC's computer systems and databases, which can only be accessed by SNMC employees who have been given express access to the information based on their need to work on the respective client's loan or mortgage file; and

d.    Storing and maintaining the vast majority of the information at issue on secure servers wherein the information and materials are password protected, and accessible only to certain employees with a business need who have been granted access.

84.    CMG facilitated, condoned, conspired with, aided, abetted, and/or induced the Scottsdale and Glendale loan originators to disclose SNMC's confidential information to CMG, and subsequently used the confidential information it wrongfully obtained.

85.    CMG misappropriated SNMC's confidential information and used it for its own benefit and to compete with SNMC, including by soliciting away SNMC's employees and customers.

86.    CMG continues to use the confidential information for its own benefit.

87.    As a direct and proximate result of CMG's misappropriation, SNMC has suffered

-15-

BUCHALTER 107818624v4

and will continue to suffer substantial and irreparable damage, the full extent of which has not yet been determined and will be established at trial.

88.    SNMC is entitled to injunctive relief and to recover from CMG any monetary damages sustained as a result CMG's misappropriation of SNMC's confidential information, including both the actual loss caused by misappropriation and the unjust enrichment resulting from the misappropriation that is not taken into account in computing actual loss.

89.    Additionally, the misappropriation of SNMC's confidential information by CMG was willful and malicious and, therefore, the Court should award punitive damages for CMG's misconduct.

### COUNT IV
### (Unjust Enrichment)

90.    SNMC realleges and incorporates all preceding allegations as though fully set forth herein.

91.    CMG was enriched at SNMC's expense in at least the following ways:

a.    By receiving SNMC's proprietary information and data, CMG obtained active referral pipelines and ready-to-close mortgage business, which had already been nurtured and maintained at SNMC's expense.

b.    By importing Plaintiff's CRM databases, CMG acquired proprietary lead intelligence for which SNMC had invested time, capital, and other resources.

c.    Throughout August and early September, 2024, SNMC continued paying wages, commissions, and other benefits to the Scottsdale and Glendale employees while CMG reaped the benefit of their labors.

92.    SNMC was impoverished.

93.    SNMC was impoverished as a direct result of the diversion of SNMC's personnel and business from SNMC to CMG.

-16-

94.   CMG's enrichment and SNMC's resultant impoverishment were unjust – CMG knowingly accepted all of the aforementioned economic advantages without reimbursing or otherwise compensating SNMC.

95.   SNMC did not intend or expect that its expenditures related to maintaining its Scottsdale and Glendale branches would be to its detriment and to CMG's benefit.

96.   The circumstances were such that in good conscience CMG should provide compensation to SNMC for the unjust enrichment.

**COUNT V**
**(Aiding and Abetting)**

97.   SNMC realleges and incorporates all preceding allegations as though fully set forth herein.

98.   By engaging in the conduct set forth herein, the former SNMC employees, breached their fiduciary duties to SNMC, including without limitation by failing to disclose to and withholding information from SNMC of CMG's efforts to hire and solicit SNMC's employees, encouraging SNMC employees to violate their restrictive covenants, diverting and soliciting SNMC's clients, client prospects, and employees, using, removing, and disclosing SNMC's confidential and trade secret information.

99.   They further breached their fiduciary duties by orchestrating each and all of the foregoing, and by collaborating with each other and with CMG to inflict as much damage as possible on SNMC through timed resignations, leaving SNMC without adequate staff and support to fairly compete and protect its legitimate business interests in response.

100.   The aforementioned former SNMC employees engaged in and orchestrated the foregoing conduct while employed by SNMC, thereby owing SNMC on-going fiduciary duties, and while owing residual fiduciary duties to not use or disclose SNMC's trade secret and confidential information.

-17-

101.   The conduct of the aforementioned former SNMC employees, in collaboration with CMG, caused injury to SNMC.

102.   Defendant CMG had knowledge of the breach of duties, and actively encouraged and facilitated said breaches, committed by the aforementioned former SNMC employees.

103.   Defendant CMG provided substantial assistance or otherwise encouraged the aforementioned former SNMC employees to breach their duties to SNMC, thereby aiding and abetting the breaches.

104.   The actions of CMG were a contributing factor to the violations that occurred.

105.   CMG's conduct was willful and malicious and, therefore, the Court should award SNMC punitive damages for CMG's misconduct.

### **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff SNMC requests judgment against CMG, as follows:

(A)   That SNMC have and recover from CMG monetary damages in such amount as will be shown at trial, including but not limited to lost profits and punitive damages;

(B)   That the Court order an award to SNMC of all monetary damages sustained as a result of CMG's misappropriation of SNMC's trade secret information, including both the actual loss caused by misappropriation and the unjust enrichment caused by the misappropriation of the trade secret that is not taken into account in computing actual loss, as well as exemplary damages against CMG in an amount not to exceed twice any award of compensatory damages and/or award of damages for unjust enrichment;

(C)   That the Court order an award to SNMC of punitive damages for the malicious and willful harms caused by CMG;

(D)   That the Court award SNMC pre- and post-judgment interest on all monetary amounts as provided by law;

-18-

(E)    For an award of reasonable attorneys' fees and costs pursuant to A.R.S. §§ 12-341, 12-341.01, 44-404, and, and any and all statutory or common law grounds for awarding fees and costs; and

(F)    Such other and further relief as the Court deems just and proper.

### JURY DEMAND

SNMC demands a trial by jury.

DATED: March 13, 2026.


**BUCHALTER LLP**

By:   /s/ Stephen F. Best
      Chris Mason
      Stephen F. Best
      Attorneys for Plaintiff

-19-

BUCHALTER 107818624v4